# EXHIBIT B



# STATEMENT OF REASONS of

## VICE CHAIRMAN WOLD and

## COMMISSIONERS LEE ANN ELLIOTT,

## DAVID M. MASON and,

## KARL J. SANDSTROM

### On The Audits Of

**"DOLE FOR PRESIDENT COMMITTEE, INC." (PRIMARY),**

**"CLINTON/GORE '96 PRIMARY COMMITTEE, INC.,"**

**"DOLE/KEMP '96, INC." (GENERAL),**

**"DOLE/KEMP '96 COMPLIANCE COMMITTEE, INC." (GENERAL),**

**"CLINTON/GORE '96 GENERAL COMMITTEE, INC.," and**

**"CLINTON/GORE '96 GENERAL ELECTION**

**LEGAL AND COMPLAINCE FUND"**

Pursuant to 26 U.S.C. §§ 9038(a) and 9007(a), the Federal Election Commission ("the Commission") audited the "Dole For President Committee, Inc.," the "Clinton/Gore '96 Primary Committee, Inc.," "Dole/Kemp '96, Inc.," the "Dole/Kemp '96 Compliance Committee, Inc.," the "Clinton/Gore '96 General Committee, Inc." and the "Clinton/Gore '96 General Election Legal And Compliance Fund." In doing so, our Audit Division and Office of General Counsel (collectively the "staff") analyzed media advertisements the Democratic and Republican National Committees (collectively "the parties") ran during 1995 and 1996. The purpose of this analysis was to determine whether the cost of these advertisements constituted in-kind contributions (coordinated expenditures) by the parties on behalf of their respective presidential candidates' committees (which, among other things, could have caused the presidential committees to exceed their primary or general election spending limits in violation of 2 U.S.C. § 441a(b)).

In analyzing these advertisements, the staff examined their content for the presence of two factors to determine whether the advertisement were "for the purpose of influencing" an election for Federal office, as that phrase is used in 2 U.S.C. § 431 (8)(A) ("contribution") and (9)(A) ("expenditure"): Whether the advertisements referred to a "clearly identified candidate" and whether they contained an

"electioneering message". Because the staff found that both factors were present, the staff recommended that the Commission determine that the costs of the advertisements were in-kind contributions from the parties to their respective presidential campaign committees. The staff also recommended that the Commission determine that the applicable spending limits were exceeded based in part on the cost of the advertisements and that the Commission require a repayment of presidential matching funds. For various reasons, the Commissioners unanimously rejected the staff's repayment recommendations.

We write here to express our disagreement with the use of "electioneering message" as a test to determine whether communications are "for the purpose of influencing" elections and, therefore, constitute expenditures or contributions under the Federal Election Campaign Act ("FECA"). Specifically, we agree that: (1) The phrase "electioneering message" cannot serve as a substantive test to describe the content of communications that are "for the purpose of influencing" an election because it is derived only from advisory opinions and is not found either in the FECA or in regulations promulgated by the Commission in accordance with the rulemaking procedures specified in the FECA; and (2) The phrase "electioneering message" cannot be used as a shorthand expression of the Commission's interpretation of the statutory standard of "for the purpose of influencing" an election because the advisory opinions from which the phrase is drawn do not convey a clear and consistent application of the statutory standard, and the phrase, standing alone, is both too vague and too broad to have a sufficiently definite meaning. Therefore, we conclude that the phrase "electioneering message" should not be used to describe the content of communications which the Commission would determine to be "for the purpose of influencing" an election to Federal office.

### Procedural Defects With Employing The "Electioneering Message" Standard

Congress included an express prohibition in the FECA against the Commission using advisory opinions to establish rules of conduct. Subpart (b) of 2 U.S.C. § 437f, the section governing the use of such opinions, provides that the Commission may employ rules of law that are not set forth in the FECA only if it complies with the procedures set forth in 2 U.S.C. § 438(d) in promulgating them. By necessary implication, subpart (b) of § 437f prohibits the Commission from using advisory opinions as rules of law, for the Commission does not follow the requirements of 2 U.S.C. § 438(d) in drafting such opinions; instead, it follows the requirements of § 437f.

As a result, the Commission may not use advisory opinions as a substitute for rulemaking. Rulemaking is not simply the preferred method for filling in gaps in the FECA. It is the required method. 2 U.S.C. § 437f(b), note five, *supra*. Where the law is of uncertain application, advisory opinions cannot be used as a sword of enforcement. *See generally id*. The regulated community can, however, use advisory opinions as shields against Commission enforcement actions in appropriate circumstances. 2 U.S.C. § 437f(c).

> Advisory opinions are binding only in the sense that they may be relied on *affirmatively* by any person involved in the specific transaction or activity discussed in the opinion or in any materially indistinguishable transaction or activity. . . . On the other hand, to the extent that the advisory opinion *does not affirmatively approve* a proposed transaction or activity, it is binding on no one – not the Commission, the requesting party, *or third parties*.

This reading of the FECA's rulemaking requirements, of course, does not prevent the Commission from enforcing the FECA in novel or unforeseen circumstances. It only requires that, absent controlling regulations or the authoritative interpretations of the courts, the Commission's enforcement standard be the natural dictate of the language of the statute itself.

The threshold problem with the "electioneering message" standard, then, is that it is not a rule. It is only a shorthand phrase that purports to describe the Commission's reasoning in two advisory opinions. See note two, *supra*. The phrase is not defined in either of those opinions. In fact, it does not appear at all in one of them. Rather than being promulgated pursuant to the requirements of the FECA (*see* 2 U.S.C. §§ 438(d) and 437f(b) & (c)), the "electioneering message" standard is an amalgam of these advisory opinions. Even at that, it is not the most natural, let alone the only reasonable, reading of those opinions. In fact, it is difficult to draw any clear meaning from a comparison or combination of AOs 1984-15 and 1985-14 (*see* "Substantive Difficulties," *infra*).

As a result, the regulated community most likely does not have *notice* as to how this standard will govern its conduct, and it certainly did not have an opportunity to *comment* on whether it should. Because of its procedural infirmities, the Commission may not employ the phrase "electioneering message" as expressing a general rule for determining whether communications are "for the purpose of influencing" a federal election.

### Substantive Difficulties With The "Electioneering Message" Standard

Apart from its procedural infirmities, the "electioneering message" standard suffers from serious problems of vagueness and overbreadth. As presented by the staff, a communication satisfies this standard if it includes statements which are "designed to urge the public to elect a certain candidate or party," or which would tend to diminish support for one candidate or garner support for another candidate." *See, e.g.*, Report on DFP, Agenda Document 98-87, 11/19/98 at 14 (citing AO 1984-15); Report on CGP, Agenda Document 98-87, 11/19/98 at 10 (citing AO 1984-15).

Such formulations, the Supreme Court has held, offend the First Amendment. In *Buckley v. Valeo,* 424 U.S. 1, 42-44 (1976), the High Court held as impermissibly vague the "relative to . . . advocating the election or defeat of [a clearly identified] candidate" standard in 18 U.S.C. § 608(e) (1970) of the original FECA. The "diminish support for one candidate" prong – like the "relative to" standard in the original FECA – is especially problematic because "the distinction between discussion of issues and candidates and *advocacy of election or defeat of candidates* may often dissolve in practical application." *Buckley,* 424 U.S. at 42 (emphasis added).

The factual question of what a particular statement was *designed* to do also gives rise to vagueness problems. The fact that the term "electioneering" and the phrase "designed to urge the public to elect a certain candidate or party" were plucked out of context from a four-decade old Supreme Court opinion (*United States v. Auto Workers,* 352 U.S. 567 (1957) (*UAW*)) does not resolve the question. First, it is clear that *UAW* was not enunciating a constitutionally-permissible standard for regulating speech, but describing a particular communication in the course of an opinion explicitly refusing to reach a ruling on the constitutionality of regulating the specific speech so described. *See id*. at 591 (internal citation omitted) ("Clearly in this case it is not absolutely necessary to a decision to canvass the constitutional

issues."). Second, the speech at issue in *UAW* included specific endorsements of candidates. *Id.* at 584. Third, the *per curiam* opinion in *Buckley* cites the dissent in *UAW*, *see* 424 U.S. at 43 (citing *UAW*, 352 U.S. at 595-596 (Douglas, J., dissenting)), which had urged that the FECA's predecessor statute be declared unconstitutional as applied to the electioneering speech at issue in *UAW*.

The relationship, if any, of the two prongs of the "electioneering message" test underscores the test's vagueness. Read narrowly, "urge the public to elect a candidate," AO 1985-14 at 7, could be construed as equivalent to communications "that expressly advocate the election or defeat of a clearly identified candidate." *Federal Election Commission v. Massachusetts Citizens For Life, Inc.,* 479 U.S. 238, 249-250 (1986) (quoting *Buckley,* 424 U.S. at 80). In contrast, there is virtually nothing which could be said about a candidate for federal office which might not be interpreted as " diminish[ing] support for one candidate [or] garner[ing] support for another candidate." *See*, *e.g.*, Report on DFP, Agenda Document 98-87, 11/19/98 at 14 (citing AO 1984-15); Report on CPG, Agenda Document 98-87, 11/19/98 at 10 (citing AO 1984-15).

The "electioneering message" test is also unconstitutionally overbroad for related reasons. As the *Buckley* Court observed,

> [c]andidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest.

424 U.S. at 42. Regulation of any statement which " diminishes [or garners] support for [a] candidate," AO 1984-15 at 5, would encompass, then, virtually any meaningful utterance identifying a candidate.

The vagueness and overbreadth problems of the "electioneering message" and "relative to" standards are thus two sides of the same counterfeit coin. They are vague because it is not clear when they encompass issue discussion and not candidate advocacy. They are overbroad because, given the nature of campaigning, they will inevitably encompass both. For the same substantive reasons that the Supreme Court held the "relative to" standard in the FECA to be unconstitutional, the Commission may not employ "the electioneering message" standard. Even in the context of coordinated, or presumably coordinated, communications in which the "electioneering message" test has generally been proposed (*see* 11 C.F.R. § 114.4(c)(5)(ii)(B)(2)(E) (regulation of voter guides)), the Commission may not ignore these constitutional requirements.

## Conclusion

Given the procedural and substantive infirmities with the "electioneering message" standard, the Commission may not employ it in administering the FECA, the Presidential Primary Matching Payment Account Act, the Presidential Election Campaign Fund Act, or its own regulations.

June 24, 1999

Darryl R. Wold
Vice Chairman

Lee Ann Elliott
Commissioner

David M. Mason
Commissioner

Karl J. Sandstrom
Commissioner